**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Chief Judge Marcia S. Krieger**

Civil Action No. 14-cv-01718-MSK-KMT

SATYA WIMBISH,

      Plaintiff,

v.

NEXTEL WEST CORP., d/b/a Sprint,

      Defendant.

_____

**OPINION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to the Defendant's ("Sprint") Motion for Summary Judgment (**# 29**), Ms. Wimbish's response (**# 34**), and Sprint's reply (**# 35**).

**FACTS**[1]

Ms. Wimbish was hired by Sprint in 2007. Initially, her duties required her to take phone calls from employees in Sprint's retail locations, providing customer service and account information. At the time she was hired, Ms. Wimbish made it known that her religious

_____

[1] As required by the summary judgment paradigm, the Court's factual recitation normally draws heavily from the non-movant's – here, Ms. Wimbish – version of events. That task is not so easy in this case. Ms. Wimbish's *pro se* Complaint (**# 1**) consists of a single-paragraph summary of her contentions, with the remainder of her pleading consisting of numerous paragraphs of various demands Ms. Wimbish makes on Sprint to modify its policies. Ms. Wimbish's response (**# 34**) to Sprint's motion is a four-page document that recites various facts but points to no supporting evidence.

In deference to Ms. Wimbish's *pro se* status and her apparent lack of familiarity with litigation formalities, the Court will assume that, if called upon to affirm the truth of the allegations in her summary judgment response under penalty of perjury, she would do so. Accordingly, the Court will treat her response as an affidavit under 28 U.S.C. § 1746. The factual recitation herein, then, will consist of Sprint's detailed factual presentation, with situations in which Ms. Wimbish's affidavit disputes particular facts expressly noted.

observances might require some degree of schedule accommodation.  Specifically, she indicated that she would require Sunday mornings and afternoons off in order to attend church services. Ms. Wimbish's schedule accommodated that need, providing her with Sundays off.  She remained in that position, without complaint, until 2010, when her job performance declined.

In September 2010, Ms. Wimbish transferred to Sprint's "eChat" group.  In the new position, Ms. Wimbish had to re-bid for shift assignments.  Ms. Wimbish submitted a ranked list of her preferred shifts, and, in the process, informed Sprint that "FYI: I have to go to Church Sundays and Wednesdays."  More particularly, according to her deposition testimony, her church schedule involved services and activities on Sunday mornings/afternoons and on Wednesday evenings.  The only available shifts in the eChat department entailed consecutive days off, making it impossible for Ms. Wimbish to locate a shift that offered both Wednesdays and Sundays off.  However, she was able to obtain her second choice of shifts, a 2:00 pm to 11:00 pm shift with Tuesdays and Wednesdays off.   Although this schedule accommodated her Wednesday church services, it caused a degree of friction with her Sunday church services, insofar as: (i) those services ended about 1:00 p.m., (ii) Ms. Wimbish often felt compelled to stay after services ended to engage in prayer with other congregants, often well into Sunday evenings, and (iii) Ms. Wimbish relied on public transportation to reach Sprint, making it difficult to arrive for a 2:00 p.m. shift on Sundays in any event.

In October 2010, Ms. Wimbish met with her direct supervisor, Eric Morning, and Mr. Morning's supervisor, Gary Klassen, to discuss the possibility of religious accommodations.[2] Ms. Wimbish requested that her schedule be adjusted to provide for both Sundays and

---

[2]     Ms. Wimbish's affidavit expresses some frustration at the lack of clarity in Sprint's policies as to whom in the eChat group she should direct her request for a religious accommodation, but she acknowledges that the October 2010 meeting occurred and does not materially dispute Sprint's description of the events that occurred in that meeting.

Wednesdays off.  Sprint declined, offering two separate reasons.  First, it explained that the

eChat group was not meeting its performance expectations on Sundays as it was, and thus, it was

impossible to simply relieve Ms. Wimbish of her duties on Sundays; if it did so, it would have to

schedule other employees to work overtime to fill that Sunday shift.  Second, Sprint states that

"the eChat group's schedule simply did not offer split days off at that point in time."  Ms.

Wimbish's affidavit obliquely suggests that Mr. Morning and Mr. Klassen offered a third

justification as well: that they "couldn't let me have the days off I requested because [they]

already told two other people no and it wouldn't be fair to them."   (Although she does not

elaborate, she does go on to acknowledge that they "later added that business needs did not allow

for the accommodation.")

     Sprint alleges, and Ms. Wimbish does not specifically dispute, that Mr. Morning and Mr.

Klassen offered Ms. Wimbish certain additional options for dealing with her Sunday shifts.

Among other things, they advised her that: (i) she could seek to temporarily or permanently swap

shifts with other employees; (ii) she could use accumulated paid time off and other benefits to

cover for situations in which she was unable to begin her Sunday shifts on time; and (iii) that she

could be allowed to arrive up to two hours late for her Sunday shifts.  The record reflects that

Ms. Wimbish made some attempts (with Mr. Morning's assistance) to locate co-workers who

might swap shifts, but was unsuccessful.  She did not avail herself of the opportunity to start her

Sunday shifts late (as her church activities often extended past the delayed (4:00 p.m.) start time

in any event).  Thus, she primarily availed herself of the second option, using paid time off and

other accrued benefits to excuse her missed Sunday shifts.  Most significantly, Ms. Wimbish

appeared to spend her "attendance points" to cover her missed shifts.  Sprint grants each

employee a certain number of "points," and employees who are late for or miss a shift are

docked a given number of points.  Employees who fall below certain critical point thresholds are automatically issued disciplinary letters, and employees who completely exhaust their supply of points are subject to termination.

In February 2011, Ms. Wimbish bid for and obtained a different work schedule: 11:45 a.m. to 8:45 p.m. with Sundays and Mondays off.  Although this schedule accommodated her Sunday church obligations, it presented new conflicts with her Wednesday evening activities. Ms. Wimbish primarily addressed this conflict by leaving early on Wednesdays, further depleting her accrued benefits.  In April 2011, Ms. Wimbish had sufficiently depleted her stock of accrued attendance points, and she was issued a written warning.  At that time, Mr. Morning and Mr. Klassen met with her and again discussed her requests for Sundays and Wednesdays off. They informed her that they could now offer her that accommodation, as she was no longer scheduled for Sundays and because the eChat group's Wednesday performance was acceptable; thus, Sprint could conceivably allow Ms. Wimbish's Wednesday shift to go unfilled.

At this point, the chronology becomes a bit muddled.  Ms. Wimbish did not immediately accept the offer.  She stated that she would have to "think about it," and took several weeks to mull it over.  It appears that Ms. Wimbish's reluctance to accept the proffered accommodation may have been based on information that she had received from Dan Sherwood, an individual whose status within Sprint is unclear.  (Ms. Wimbish's affidavit refers to him only as "a manager," but in her deposition, she states that Mr. Sherwood and Mr. Morning/Mr. Klassen are in "two separate departments.")  Mr. Sherwood advised Ms. Wimbish that she would have to fill out a "school exception form" every four weeks to maintain the accommodation.  Ms. Wimbish described the form as a one-page document that would take her about two minutes to fill out, although she states that Mr. Sherwood told her that there was no guarantee that her request

4

would continue to be approved in the future.  While she deliberated as to whether to accept the accommodation, Ms. Wimbish continued to miss her Wednesday shifts and further depleted her bank of attendance points, resulting in a second warning on April 20 and a third and final warning on April 26.

On April 28, 2011, Ms. Wimbish decided to accept the proffered accommodation.  There was apparently some confusion over how it would be implemented, as Mr. Sherwood initially challenged Ms. Wimbish when she sought to leave early.  Ms. Wimbish had Mr. Sherwood contact Mr. Klassen, and Mr. Klassen confirmed that Ms. Wimbish was entitled to the accommodation.  Mr. Sherwood apparently got upset and demanded that Ms. Wimbish complete certain forms and reminded her that the accommodation was subject to re-approval every four weeks.[3]  (It does not appear that Mr. Morning and Mr. Klassen shared Mr. Sherwood's opinion of the accommodation as temporary, as Mr. Morning had stated in writing to Ms. Wimbish that this accommodation would be effective "until further notice.")  It appears that Mr. Sherwood's confrontation taxed Ms. Wimbish to the breaking point.  On the following day, April 29, 2011, Ms. Wimbish submitted a resignation letter, stating that "I cannot stay here anymore" because she had "not been able to get a reasonable resolution" of her requests for a religious accommodation.

Ms. Wimbish commenced this action *pro se*, asserting a single claim of religious discrimination in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.*, under a failure to accommodate theory.  Sprint now moves **(# 29)** for summary judgment on that claim, alleging that Ms. Wimbish cannot demonstrate that she suffered an adverse employment action and cannot show that her request for a reasonable accommodation was denied.

---

[3]    This may be the actual interaction between Ms. Wimbish and Mr. Sherwood as referenced in the preceding paragraph.

## ANALYSIS

### A.  Standard of review

#### 1.  Summary judgment standard

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary.  *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  Substantive law governs what facts are material and what issues must be determined.  It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989).  A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party.  *See Anderson*, 477 U.S. at 248.  When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby favoring the right to a trial.  *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence.  *See* Fed. R. Civ. P. 56(c)(1)(A).  Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute.  *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999).  If there is a genuine

dispute as to a material fact, a trial is required.  If there is no genuine dispute as to any material fact, no trial is required.  The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required.  If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

### 2. *Pro se* standard

Ms. Wimbish brings this action *pro se*.  Accordingly, the Court construes her pleadings liberally.  *Haines v. Kerner,* 404 U.S. 519, 520-21 (1972).  However, *pro se* status does not relieve Ms. Wimbish of the obligation to muster sufficient evidence to demonstrate a colorable claim under the applicable substantive law.  *Ogden v. San Juan County*, 32 F.3d 452, 455 (10th Cir. 1994).

### B.  Religious accommodation

Title VII prohibits, among other things, discrimination on the basis of religion.  42 U.S.C. § 2000e-2(a)(1).  This proscription includes an obligation on employers to reasonably accommodate employees' religious observances, unless the employer can show that such an accommodation would amount to an undue hardship.  42 U.S.C. § 2000e(j).

To establish a claim for religious discrimination under a failure to accommodate theory, an employee must first establish a *prima facie* case by showing: (i) the employee had a bona fide religious belief that conflicted with an employer requirement; (ii) the employee notified the

employer of the belief; and (iii) the employer took some adverse action based on the employee's failure to comply with the employer's requirement. *Thomas v. Natl. Assn. of Letter Carriers*, 225 F.3d 1149, 1155 (10th Cir. 2000). The burden then shifts to the employer to either conclusively rebut one of the elements of the *prima facie* case, to show that it offered a reasonable accommodation, or to show that it could not accommodate the employee's needs without suffering an undue hardship. *Id.* at 1156.

It is undisputed that Ms. Wimbish had bona fide religious beliefs, manifested in the form of religious observances on Sundays and Wednesdays, that conflicted with her schedule at Sprint. It is also undisputed that she informed Sprint of this fact. However, her claim becomes more problematic at the third element of the *prima facie* case: the adverse action.

Turning first to Ms. Wimbish's separation from employment, it is undisputed that she voluntarily resigned her job on April 29, 2011. Such a resignation precludes any finding that her separation from employment constituted an adverse action. *Fischer v. Forestwood Co.*, 525 F.3d 972, 980 (10th Cir. 2008).

Although Ms. Wimbish does not raise the issue on her own, the Court has also considered, *sua sponte*, whether the evidence here would support an argument by Ms. Wimbish that her resignation was a constructive discharge. A constructive discharge occurs when an employer, through unlawful acts, makes working conditions so intolerable that a reasonable plaintiff in the employee's position would feel forced to resign. *Id.* The burden to establish a constructive discharge is high, and a mere showing that working conditions were difficult or unpleasant will not suffice. *Id.* at 981.

Here, although Ms. Wimbish might have been justified in feeling frustrated at Sprint's inelegant handling of her accommodation requests, or even felt whipsawed between Mr.

Sherwood and her direct supervisors, the Court cannot say that, under the necessary objective standard, that her discomfort is enough to create a colorable claim that she was constructively discharged. *Id.* at 980 (standard is an objective one). The record reflects that Mr. Wimbish was informed by Mr. Klassner and Mr. Morning, her direct supervisors, that she would be granted the accommodation "until further notice." They acknowledged that she might have to periodically file a form on a periodic basis to maintain that accommodation, but nothing in their communications with Ms. Wimbish would justify her belief (apparently induced by Mr. Sherwood) that future requests to continue that accommodation might be denied. A reasonable employee in Ms. Wimbish's position would have taken simple steps to resolve the situation short of resignation, such as seeking out further clarification from Mr. Klassner or Mr. Morning about the duration of the accommodation or requesting their intercession with Mr. Sherwood to verify her entitlement to the new schedule on an extended basis. Because the facts would not support a claim that Ms. Wimbish was constructively discharged, her resignation does not constitute an adverse action for purposes of a Title VII claim.

The Court then moves a few weeks backwards in time to Sprint's issuance of attendance warnings to Ms. Wimbish in April 2011 can constitute an adverse action. The Court has some doubt as to whether these notifications can constitute an adverse action. A written warning or reprimand generally does not rise to the level of adverse action for purposes of a retaliation claim unless a plaintiff can show that it increased the likelihood that she would be fired, undermined her current job status, or affected her future employment. *Medina v. Income Support Div.*, 413 F.3d 1131, 1137 (10th Cir. 2005); *see also Couch v. Bd. of Trustees of Mem'l Hosp. of Carbon City*, 587 F.3d 1223, 1238-39 (10th Cir. 2009). Here, the record reflects that the disciplinary notices were issued automatically when an employee's allocation of attendance points had

depleted below a certain amount.  The notices themselves did not increase the risk that an employee would be terminated; they merely served as a warning that full depletion of an employee's allotment of points would have that result.  Thus, the Court cannot say that, on this record, even the issuance of warning notices to Ms. Wimbish could constitute an adverse action.

Even assuming they could, however, the Court finds that Sprint has adequately demonstrated that it offered reasonable accommodations to Ms. Wimbish to resolve the conflict between her work schedule and her church schedule.  The record reflects that Sprint offered Ms. Wimbish accommodations on two different occasions.  The first, in October 2010,[4] offered to permit Ms. Wimbish to swap schedules with another employee in order to relieve the conflict; indeed, the record reflects that Mr. Morning (unsuccessfully) undertook some efforts to help Ms. Wimbish find a co-worker to swap with.  This alone would have been sufficient to discharge Sprint's obligations to accommodate Ms. Wimbish.  *Thomas*, 225 F.3d at 1156-57, *citing U.S. v. Albuquerque*, 545 F.2d 110, 114 (10th Cir. 1976).  Although Ms. Wimbish might have wanted something more permanent, Title VII does not entitle an employee to the accommodation of his or her choice, nor does it guarantee an accommodation that completely resolves the conflict between work and religious observance.  *Lee v. ABF Freight Sys., Inc.*, 22 F.3d 1019, 1022-23 (10th Cir. 1994).

The Court finds that, as a matter of law, by offering to approve shift swaps with other co-workers, coupled with Sprint's willingness to allow Ms. Wimbish to use other employee benefits, including accrued leave and attendance points, to account for shifts for which no swap could be arranged, Sprint offered Ms. Wimbish a reasonable accommodation.  The record reflects that anything greater would have placed an undue hardship on Sprint.  *Id.* at 1023

---

[4]     The Court offers no opinion as to whether a claim based on the October 2010 offer of accommodations would be timely.

(requiring employer to bear more than *de minimis* cost to replace the lost production of an accommodated worker can amount to an undue hardship).

The Court then turns to the accommodation offered to Ms. Wimbish in April 2011.  As noted above, that accommodation was essentially complete. It resolved Ms. Wimbish's schedule conflicts on both Sundays and Wednesdays, and did not require Ms. Wimbish to obtain the consent of co-workers to obtain or maintain that accommodation.  The only apparent drawback to the proposed accommodation was the possibility that Ms. Wimbish might have to spend two minutes per month completing a form to continue to retain the accommodation.  The Court cannot say that this minimal administrative requirement alone is sufficient to convert the accommodation from a reasonable one to an unreasonable one.  Although Ms. Wimbish raises certain questions about whether this accommodation was indeed permanent (as Mr. Klassen and Mr. Morning appeared to indication) or whether it was temporary and subject to discretionary denial (as Mr. Sherwood seemed to assert), Ms. Wimbish could have trivially resolved these questions by simply asking her supervisors for clarification.  As the 10th Circuit noted in *Lee*, once an employer has proffered a reasonable accommodation, an employee has a "correlative duty" to make a good faith effort to satisfy his or her needs through the means offered by the employer.  22 F.3d at 1022.  Here, good faith efforts by Ms. Wimbish to clarify the contours of the proposed accommodation could have resolved her concerns or, at least, highlighted those details that might make the proffered accommodation unreasonable.  Because Ms. Wimbish did not undertake such efforts, instead choosing to resign, the Court finds no genuine dispute of fact that would preclude Sprint from carrying its burden to rebut Ms. Wimbish's *prima facie* case.

Accordingly, the Court finds that Sprint is entitled to summary judgment on Ms. Wimbish's claim.

## CONCLUSION

For the foregoing reasons, Sprint's Motion for Summary Judgment **(# 29)** is **GRANTED**.

The Clerk of the Court shall enter judgment in favor of Sprint and shall close this case.

Dated this 29th day of March, 2016.

**BY THE COURT:**

_____

Marcia S. Krieger
Chief United States District Judge